**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ISAAC BROOKS,** | **CIVIL ACTION** |
|           **Plaintiff,** | |
| | |
|     **v.** | |
| | |
| **TEMPLE UNIVERSITY HEALTH** | **NO.  21-1803** |
| **SYSTEM, INC., TEMPLE UNIVERSITY** | |
| **HOSPITAL,** | |
|           **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

This employment discrimination suit concerns disputes between Plaintiff Isaac Brooks and Defendants Temple University Health System, Inc. ("TUHS") and Temple University Hospital, Inc. ("Temple Hospital").  Plaintiff brings discrimination, retaliation, and hostile work environment claims under: Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), the Pennsylvania Human Relations Act, 43 Pa. C.S. §§ 951, *et seq*. ("PHRA"), and the Philadelphia Fair Practices Ordinance, Phila. Code § 9-1100 *et seq*. ("PFPO").  Defendants move for summary judgment on all of Plaintiff's claims.  For the reasons that follow, Defendants' motion will be denied.

## I.    BACKGROUND[1]

Temple Hospital Episcopal Campus ("Episcopal Hospital") provides inpatient and outpatient behavioral and primary care services.  Episcopal Hospital's Department of Environmental Services ("EVS") is charged with the important task of cleaning and sanitizing the hospital.  EVS Assistants ensure that the entire hospital is cleaned and maintained at all times.

---

[1] Unless otherwise noted, the following facts are undisputed between the parties.

1

Plaintiff Isaac Brooks is a 33-year-old homosexual male who presents in a feminine manner and wears feminine clothes, perfume, and fingernail polish.  Plaintiff began work at Episcopal Hospital in December 2019 as an EVS Assistant.  He was hired by Frank Donato, the Director of EVS.

Plaintiff asserts that, throughout his tenure at EVS, he was subjected to numerous homophobic comments at the hands of two EVS Supervisors—Robert St. John and Paul Ray— and two other EVS Assistants, Roderick Danley and Jackie Haynesworth.  All of the aggressors are heterosexual individuals.  In particular, Plaintiff testified that St. John and Danley would call him a "faggot," and that Danley and Haynesworth would make comments about his "girly clothes," and "girly perfume," as well as other aspects of his appearance.  Plaintiff also testified that, while cleaning parts of the hospital floor on his hands and knees, Danley would remark, "you like to be bent over, don't you?" and made other references to Plaintiff "bend[ing] over." Plaintiff further testified that he was asked insulting questions, such as "are you a girl or a boy?" and that he was regularly called other nicknames mocking his femininity, such as "sugar man"; soap opera star "Susan Lucci"; and "green-eyed devil."

Plaintiff asserts that these comments occurred throughout his employment and increased toward the end of his time at EVS.  Plaintiff testified that he complained to Donato about these comments, and insisted on reporting them to human resources ("HR").  According to Plaintiff, Donato would discourage Plaintiff from going to HR, and became less kind towards Plaintiff after he began making these complaints.

None of the individuals were disciplined for the alleged conduct.  Defendants assert that this is because none of the allegations are true; Plaintiff maintains that it is because no one ever investigated his complaints.  On January 15th, 2021, Plaintiff was terminated from EVS on the

stated basis that he violated Temple's Workplace Harassment and Violence Policy and

Corrective Action/Discipline policy by threatening other employees on two separate occasions:

July and October 2020, the facts of which are described in more detail below.

### A. July 7th, 2020 Incident

Around July 3rd, 2020,[2] Plaintiff complained to Donato that Jackie Haynesworth called

him a "faggot" while she was talking on her cell phone.  Specifically, Plaintiff complained that

when he greeted Haynesworth, she told whoever was on the other end of the line, "now that

faggot wants to talk to me."

On July 7th, Donato called a meeting with Plaintiff and Haynesworth, as well as weekday

supervisor Paul Ray to discuss this incident.  The record also indicates that another EVS

Assistant, Esther McGinnis, was present for some portion of the meeting.  Haynesworth denied

ever making the comment.  The meeting quickly became loud and heated, though the parties

dispute who is at fault for the escalation—Plaintiff or Haynesworth.

According to Defendants, at some point Plaintiff told Haynsworth, "you don't have to

worry about me, you just have to worry about my mother."  Haynesworth apparently took this

comment to be a threat to her safety, and proceeded to call the police.[3]

According to Plaintiff, Haynesworth was the one who raised her voice and acted in a

hostile manner.  Plaintiff testified that rather than stating anything threatening, he in fact said,

"let me call my mom because this meeting is very ghetto."  Plaintiff explained he made this

---

[2] The parties dispute exactly when Plaintiff complained about this incident.  Defendants assert that Plaintiff only complained to Donato about Haynesworth's comment a few weeks after it occurred, which appears to be correct based on Donato's notes.  Plaintiff, however, stated in his deposition that the notes were incorrect, and that he had in fact complained to Donato about Haynesworth on the 3rd.

[3] According to Defendants, Haynesworth understood this comment to be a threat because Plaintiff had previously told Donato that his mother is "no one to be played with," and because Haynesworth's parents were recently murdered after a threat was made against them.

statement because his mother was his ride home, and he wanted to leave.

All parties agree that the event, which entailed raised voices and commotion, caused a serious disruption to the workplace.  As a result, Plaintiff was put on a two-week suspension without pay.  Haynesworth was to attend a "civil treatment class."

Following the incident, Donato instructed all witnesses involved to provide a written statement of what happened.  Donato also changed the schedules of Plaintiff and Haynesworth so that they would no longer have to see each other at work.  Though Defendants ultimately determined that Plaintiff's complaint was unsubstantiated, Plaintiff asserts that no real investigation was made into Haynesworth's comment, or the yelling match that followed it.[4]

**B. October 18th, 2020 Incident**

Another incident involving Plaintiff occurred on October 18th, 2020.  That day, Charlene Alicea, another EVS assistant, asked Plaintiff to help her by "power washing" a wheelchair.  Plaintiff declined, apparently because he did not know how to power wash the chair.  Plaintiff's refusal led to an altercation, during which Defendants contend Plaintiff screamed and cursed at Alicea.  Plaintiff denies this characterization, stating that it was Alicea who raised her voice and waved her hand at him instead.

Sometime during this fight, weekend supervisor Robert St. John—who Plaintiff testified was "picking on [him]" all weekend—intervened.  What happens next is also disputed.

According to Plaintiff, Plaintiff asked St. John if he could leave for the day because

---

[4] The parties dispute the extent and rigor of Defendants' investigation of Haynesworth's comment and the July 7th incident.  As to the comment itself, Plaintiff asserts that Donato did nothing other than ask Plaintiff and Haynesworth about what happened, and that the issue should have been escalated to HR.  Donato testified that he found nothing after speaking to two other employees about Haynesworth, and that escalating the issue to HR was unnecessary as there was no corroborating evidence of the comment available.  As to the July 7th incident, although Plaintiff argues that Defendants did not investigate the event at all, the record shows that Donato collected witness statements following the event and issued disciplinary reports to both Plaintiff and Haynesworth.

St. John's treatment of him made him uncomfortable; in response, St. John told Plaintiff to "clock the F out."  St. John also stated that he could have Plaintiff escorted out by security, to which Plaintiff responded, "Rob, you all know my boyfriend is a cop.  I know the law.  You can't put me outside in the freezing cold."  Plaintiff also told St. John that "you guys are doing the same exact thing that my [last] job do.  I want to go to HR.  I want to talk to Frank [Donato]."

According to Defendants, Plaintiff was acting out so much that calling security was necessary.  Further, Defendants aver Plaintiff did not tell St. John that he knew the law because his boyfriend was a cop; rather, Plaintiff was using the statement as a threat.  And Plaintiff threatened to sue Defendants, the same way he had his prior employer.

Following this incident, St. John emailed and called Donato to tell him what happened, and was asked by HR to further investigate.  Plaintiff was suspended for several weeks without pay.  While suspended, Plaintiff complained to Defendants at least three times.  Two days after the incident, on October 20th, 2020, Plaintiff texted Donato that "I feel like [St. John is] out to get me for no reason because he don't like me because of [our] Friendship in [*sic*] my sexuality." Around a month later, on November 25th, 2020, Plaintiff submitted a report to HR similarly stating that "I feel like Robert St. John do[es] not like me because of my sexual preference he is [v]ery dismissive and treat[s] me different from the typical straight man at the job I guess he was offended for what I said because I had told him that I was going to go to HR months ago he pulled me to the side and asked me was we cool after I told Mr. Frank!!!!!!!!"  On December 27th, 2020, Plaintiff similarly wrote a long email to HR about the July and October incidents and issues that he had with St. John.  Plaintiff also included in his email allegations that St. John made him feel uncomfortable and did not like Plaintiff because he was a gay male.  Two days later, on December 29th, 2020, Cheryl Devose (Director of Labor and Employee Relations)

approved Plaintiff's firing based on her finding that Plaintiff violated Temple's workplace conduct policies by making verbal threats to coworkers during the July and October incidents. Plaintiff was officially terminated on January 15th, 2021.

## II.   STANDARD OF REVIEW

"[S]ummary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (citations and internal quotations omitted); Fed. R. Civ. P. 56. A fact is material where it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). And, a genuine issue is present "when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch*., 480 F.3d 252, 256 (3d Cir. 2007). The moving party bears the burden of showing the absence of a genuine issue as to any material fact. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157 (1970). The non-moving party "may not merely deny the allegations in the moving party's pleadings; instead, he must show where in the record there exists a genuine dispute over a material fact." *Abington Friends Sch*., 480 F.3d at 256. In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotations and alterations omitted).

## III.   DISCUSSION

### A.  The Statutory Framework

Title VII provides: "It shall be unlawful . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race, color, religion, sex, or national

origin."  42 U.S.C. § 2000e-2(a)(1).  Discrimination because of "sex" includes sexual orientation

discrimination and gender stereotyping discrimination.  *Bostock v. Clayton Cnty., Georgia*, 140

S. Ct. 1731, 1754 (2020); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989); *Prowel v.*

*Wise Bus. Forms, Inc*., 579 F.3d 285, 286-91 (3d Cir. 2009).

　　For purposes of a summary judgment motion, the standards applicable to Plaintiff's

claims under Title VII and the PHRA are the same.  *Jones v. Sch. Dist. of Phila*., 198 F.3d 403,

409-10 (3d Cir. 1999).  The same logic applies to the PFPO, which addresses similar substantive

issues and adopted substantially the same language as its state and federal counterparts.  *See In*

*re Tribune Media Co*., 902 F.3d 384 (3d Cir. 2018) (applying Title VII framework to a case that

also included claims under the PHRA and PFPO); *Hong v. Temple Univ*., 2000 WL 694764, at

*9 (E.D. Pa., May 30, 2000) (applying Section 1981 framework to PFPO claims), *aff'd*, 261 F.3d

492 (Table) (3d Cir. 2001); *Joseph v. Cont'l Airlines, Inc*., 126 F. Supp.2d 373, 376 n.3 (E.D. Pa.

2000) (analyzing PFPO claims under Title VII standard).

　　Plaintiff's claims implicate the application of the burden-shifting framework articulated

by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  That

framework proceeds in three steps: "First, the plaintiff must establish a prima facie case of

discrimination.  If the plaintiff succeeds in establishing a prima facie case, the burden shifts to

the defendant to articulate some legitimate, nondiscriminatory reason for the [adverse

employment action].  Finally, should the defendant carry this burden, the plaintiff then must have

an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by

the defendant were not its true reasons, but were a pretext for discrimination."  *Jones*, 198 F.3d

at 410 (internal citations and quotation marks omitted) (citing *McDonnell Douglas Corp*., 411

U.S. at 802).

## B. Discrimination Claims

### i. *Prima Facie Case*

To establish a prima facie case of discrimination, Plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position he sought to retain; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). The burden of establishing a prima facie case is "not intended to be onerous," *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995), and is "easily made out." *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 523 (3d Cir. 1992), *cert. denied*, 510 U.S. 826 (1993).

The parties only dispute whether Plaintiff has met the final element of this test, *i.e.*, whether he has shown that his adverse employment actions occurred under circumstances that could give rise to an inference of intentional discrimination.

Defendants argue that Plaintiff cannot meet this element because it is "typically satisfied" by showing that a similarly situated employee outside of the protected class has been treated better than the plaintiff. Defendants insist that Plaintiff has not identified a "similarly situated" comparator because the only possible candidate, Jackie Haynesworth, is not a valid option. But Defendants apply too exacting a standard at the prima facie stage. Setting aside whether Haynesworth is a valid comparator, showing that a similarly situated comparator was treated more favorably than the plaintiff is only *one* way to make out this element of a prima facie case, not the exclusive manner of doing so. *See Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 268-69 (3d Cir. 2010) ("Although comparative evidence is often highly probative of

discrimination, it is not an essential element of a plaintiff's case.").

Rather, Plaintiff can satisfy his burden by providing some other evidence to "establish some causal nexus between [his] membership in a protected class and the [adverse action.]" *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003). The "central focus of this inquiry is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin." *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)) (citation omitted).

Here, Plaintiff has identified evidence to show a causal nexus between his sexual orientation and Defendants' decision to fire him. In particular, Plaintiff connects homophobic slurs that he testified were made against him to disciplinary actions taken against him shortly thereafter, which actions culminated in his termination. Plaintiff testified, for example, that around one or two months before his second suspension, St. John—a supervisor and later investigator of the October 18th event (which led to his second suspension)—called Plaintiff a "faggot." Plaintiff also testified that Danley made comments to Plaintiff about "bending over," and that he was suspended shortly after Haynesworth called him a "faggot" as well. A jury could therefore reasonably conclude that these comments provide evidence that Plaintiff's suspensions, and ultimate termination, was based on his sexual orientation. Plaintiff has thus made out a prima facie case of disparate treatment sex discrimination.

### ii.    Legitimate, Non-Discriminatory Reason

Defendants' burden when offering a legitimate non-discriminatory reason is "relatively light," and requires only that the employer "provide[ ] evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton*

*v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).  Defendants reason that Plaintiff was fired because of the threats they believe Plaintiff made to co-workers during the July and October incidents, which violated their policy against improper workplace conduct.  Defendants have thus met their burden to articulate a legitimate non-discriminatory reason for firing Plaintiff.

> ### iii.   Pretext

After Defendants have responded with a legitimate, non-discriminatory reason for their action, the burden shifts back once more to Plaintiff to show, by a preponderance of the evidence, that the Defendants' proffered legitimate, nondiscriminatory reason was pretextual.  *Burton*, 707 F.3d at 426-27.  In *Fuentes v. Perskie*, the Third Circuit recognized two ways in which a plaintiff can demonstrate that the employer's legitimate, nondiscriminatory reason was pretextual.  32 F.3d 759, 762 (3d Cir. 1994).  The first is for the plaintiff to point to evidence that would allow a factfinder to disbelieve the employer's reason for the adverse employment action.  *Id.* at 765.  In order to raise sufficient disbelief, the evidence must indicate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" to satisfy the factfinder that the employer's actions could not have been for nondiscriminatory reasons.  *Id.*

Alternatively, the second way a plaintiff can establish pretext is to point to evidence that would allow a factfinder to believe that an invidious discriminatory reason was "more likely than not a motivating or determinative cause" of the employer's action.  *Id.* at 764.  Specifically, the plaintiff can show pretext this way by presenting evidence "with sufficient probative force" so as to allow the factfinder to "conclude by a preponderance of the evidence that [sex] was a motivating or determinative factor."  *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644-45 (3d Cir. 1998) (citing *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1111 (3d

Cir. 1997)).  Pointing to evidence demonstrating any of the following satisfies this second way to prove pretext: (1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or, (3) the defendant has treated similarly situated members outside of the protected class more favorably.  *Simpson*, 142 F.3d at 645 (citing *Fuentes*, 32 F.3d at 765).

"A plaintiff is not required to produce evidence which necessarily leads to the conclusion 'that the employer did not act for nondiscriminatory reasons.'" *Sempier*, 45 F.3d at 728 (quoting *Sorba v. Penn. Drilling Co*., 821 F.2d 200, 205 (3d Cir. 1987), *cert. denied*, 484 U.S. 1019 (1988).  Even if the employer's actions "may have been innocent," the query is whether a jury would "reasonably question" whether the explanations provided are fabricated.  *Waldron v. SL Indus., Inc*., 56 F.3d 491, 497 (3d Cir. 1995).  If the answer is yes, the motion for summary judgment will be denied.

Defendants assert that Plaintiff is unable to show that their reason was pretextual under the McDonnell-Douglas framework for multiple reasons.  As discussed *supra*, one of Defendants' arguments is that Plaintiff has not identified a "similarly situated" employee who was treated more favorably than he was.

The standard for establishing a similarly situated employee is case-specific, but generally requires a "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Butler v. Arctic Glacier USA*, 213 F. Supp.3d 711, 716-17 (E.D. Pa. 2016) (citing *Opsatnik v. Norfolk S. Corp*., 335 F. App'x 220, 223 (3d Cir. 2009)).

Here, Plaintiff asserts that he was treated less favorably compared to a straight co-worker

who committed "serious disciplinary violations," Jackie Haynesworth.  Specifically, Plaintiff

argues that while he was suspended for an entire two weeks for stating in an altercation that he

wanted to call his mother to go home, Haynesworth went undisciplined for her hostility during

the same meeting.  According to Plaintiff, Haynesworth instigated the fight, was loud and

aggressive towards him, and disobeyed supervisors who tried to quiet her down.

In response, Defendants assert that (1) Haynesworth "could not possibly" be a similarly-

situated comparator for purposes of establishing a prima facie case, because she "never made a

threat to anyone at [EVS]," and, (2) Haynesworth was in fact disciplined for her actions at the

July 7th meeting, as she was, on paper, instructed to attend a civil treatment class.

There are two problems with Defendants' first argument.  First, Defendants' point about

Haynesworth's comparator status assumes a fact in dispute: whether Plaintiff did in fact threaten

Haynesworth.  Plaintiff himself testified that he had not, and there is some support in the record

for his version of events.  Donato's notes from the meeting state that Plaintiff had said "he

wanted to leave because this meeting isn't going anywhere, and it was ghetto, and

unprofessional."  Esther McGinnis's statement recites: "Isaac said he was going to call [his]

mother but that was all he could get out before [Haynesworth] start[ed] standing up screaming is

that a threat?"  If one were to believe Plaintiff's version of events, therefore, Haynesworth could

in fact serve as a comparator who may have been punished less severely than him, as she, too,

was causing a disruption in the workplace.[5]

The other problem with Defendants' argument is that it assumes that Haynesworth must

have engaged in *exactly* the same conduct as Plaintiff to have qualified as a comparator.  But that

---

[5] Defendants assert that McGinnis's statement should not be credited because she "missed the first half of the meeting and left the meeting early."  But, if believed, her statement suggests that she was at the meeting long enough to see the interaction she described.

is not the standard.  Rather, Plaintiff is only required to show that "two employees dealt with the same supervisor, were subject to the same standards, and had engaged in *similar* conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  *Butler*, 213 F. Supp. 3d at 716-17 (citing *Opsatnik*, 335 F. App'x at 223) (emphasis added).

The parties do not dispute that both Haynesworth and Plaintiff had Paul Ray as a weekday supervisor, and as EVS Assistants, they were subject to the same workplace conduct standards.  So, the remaining question is whether Haynesworth engaged in conduct "similar" to that of Plaintiff during the meeting.  Viewing the facts in the light most favorable to Plaintiff, a jury could reasonably conclude that Haynesworth was "similarly" hostile and disruptive during the meeting.  After all, McGinnis's statement from the meeting says that Haynesworth "was hollering and screaming . . . Paul [Ray] had to hold her around her waist as if she was holding her back."  Haynesworth's disciplinary report from the event states that she "acted unprofessionally, by creating a hostile work environment, by having confrontations with other employees, [she] w[as] very loud, when asked on several occasions by Frank Donato and also Paul Ray to calm down, but [she] proceeded to get louder, [she] also had to be held back by Paul Ray."  If these statements are true, Haynesworth's conduct could be considered sufficiently similar to Plaintiff's to cause a jury to infer that the punishment she was given (or lack thereof) was disproportionately light compared to Plaintiff's.

Which leads us to Defendants' next argument about Haynesworth's punishment.  Defendants argue that Haynesworth was punished for her conduct, because her disciplinary report states that she was to attend a "civil treatment class."  Plaintiff correctly notes, however, that Haynesworth testified that: (1) she was never disciplined for the event; (2) she never

13

attended a civil treatment class; and, (3) she had never even seen the disciplinary report at issue. Plaintiff asserts that Haynesworth's testimony is indicative of more favorable treatment towards her, a straight employee; Defendants assert that Haynesworth was not so disciplined only due to a clerical error that caused the report to be filed at the wrong hospital campus.  Even assuming Defendants' explanation for the lack of discipline were correct, however, a reasonable jury could still conclude that Haynesworth was treated more favorably than Plaintiff, as apparently no one bothered to see to it that she did in fact attend her class.  And, in any event, the parties do not dispute that having to attend a class is not as serious a punishment as being suspended for a two-week period without pay.

Defendants also argue that Plaintiff cannot show pretext because the "undisputed evidence" establishes that Plaintiff engaged in repetitive, threatening conduct.  But the above discussion demonstrates that there are actually disputes of fact as to whether Plaintiff actually made a threat during the July 7th incident.  And as to the October 18th incident—which Defendants assert was sufficient grounds for Plaintiff's termination—Plaintiff disputes that he said the specific words Defendants allege constituted a threat.   Defendant's argument is thus unavailing.[6]

Next, Defendants argue that even assuming Plaintiff's allegations about St. John's slurs

---

[6] Defendants characterize Plaintiff's testimony about the October 18th incident as the kind of "speculation" regarding an employer's discriminatory motive which cannot create a dispute of material fact.  *See Billet v. CIGNA Corp*., 940 F.2d 812, 816 (3d Cir. 1991) ("Merely reciting that age was the reason for the decision does not make it so"), *abrogated on other grounds*, *St. Mary Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).  But Plaintiff is not relying solely on his speculation that Defendants acted with a discriminatory motive; he is relying on what he said during the altercation, which is a different matter.  As discussed above, Defendants assert that Plaintiff said some variation of the words "you know my boyfriend is a cop, right?" in a threatening manner.  The record shows that some witnesses heard "you know my boyfriend is a cop and will beat you up," and "my boyfriend is a cop who will take care of you."  Plaintiff asserts that he said, "I know the law.  My boyfriend is a cop, you can't treat me like this."  No one is speculating that something along those lines was said, the parties simply disagree as to what words were used and what Plaintiff meant by them.

towards him were true, St. John was not involved in the decision to fire Plaintiff; therefore, his comments are irrelevant for purposes of finding discriminatory animus.  Defendants cite to *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d at 545 for the proposition that "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."  But the facts of *Ezold* are easily distinguished.

In *Ezold*, a gender discrimination case, the plaintiff pointed to evidence that a superior had commented in a meeting that it "would not be easy" for the plaintiff at the law firm, in part because she was a woman.  *Id.*  As further evidence of pretext, the plaintiff also pointed to several other gender-related or sexual comments made by that superior over the course of plaintiff's five-year employment with the firm.  *Id.* at 545-47.  The first comment was made before the plaintiff was hired and five years before the plaintiff was passed over for the promotion at issue.  *Id.* at 545.  In addition, the comments were all made by a superior who had departed the firm and thus was not involved in the decision not to promote plaintiff.  *Id.* at 545-47.

Here, by contrast, it is less clear-cut whether St. John was or was not involved in the decision to terminate Plaintiff.  The parties do not dispute that he was Plaintiff's weekend supervisor, and was supervising Plaintiff at the time of the October 18th incident, when Plaintiff purportedly threatened him.  At his deposition, St. John further testified that: it was he who wrote Plaintiff's disciplinary report for the October 18th incident; that he called and emailed Donato the day of the incident to explain what happened; and, that he was the one asked by HR to collect statements from witnesses to the incident, and that he did in fact collect such statements.  Moreover, rather than being made years before the date of the decision, Plaintiff testified that St.

John's comments were made only a few months prior to his termination.

Thus, it cannot be said—at least at this stage of the litigation—that St. John was merely a "non-decisionmaker[] or [] decisionmaker[] unrelated" to Plaintiff's termination.  *Id.*  Nor can it be said, under the standard in *Ezold*, that St. John's comments were "temporally remote from the date of decision." *Id.*[7]

Finally, Defendants argue that Plaintiff cannot show that Defendants' reason for his termination was pretextual because (1) "Donato allowed Plaintiff to be who he wanted to be," *i.e.*, he permitted Plaintiff to dress in a stereotypically feminine manner and had a good relationship with Plaintiff; and, (2) "the diversity of EVS makes it impossible that Plaintiff's sex was a factor in his termination."  But neither of these arguments actually contradict Plaintiff's points about pretext.  As to the first argument, it may in fact be the case that Donato had a good relationship with Plaintiff; but Plaintiff maintains that the relationship soured after he began complaining to Donato about other employees' conduct.  As to the second argument, Defendants have cited no case law for the proposition that a diverse workplace negates the possibility of discrimination against an individual.  Accordingly, the argument is waived.  *See* E.D. Pa. Local Civ. R. 7.1(c) (each motion "shall be accompanied by a brief containing a concise statement of the legal contentions and authorities relied upon in support of the motion"); *see also Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997) ("An argument consisting of no more than a

---

[7] Defendants also argue that Danley's "stray remarks" are not relevant to the pretext analysis because he was not a decision maker and was not involved in the decision to terminate Plaintiff.  The record suggests that Defendants are correct about Danley's lack of authority regarding Plaintiff's termination.  However, there is a question about whether Danley's remarks can truly be considered "stray," *i.e.*, isolated.  Plaintiff testified that Danley: called Plaintiff a "faggot"; made comments about Plaintiff "bending over"; asked questions suggesting that individuals "like" Plaintiff should not be hired; and made comments about Plaintiff's feminine appearance, all in a span of four months (July and October 2020).  Danley denied making any of these comments.  Viewing this dispute in the light most favorable to Plaintiff, Plaintiff's allegations are true, and Danley's comments cannot be properly characterized as "stray" and thus "not [due] great weight" to the pretext analysis.

conclusory assertion . . . will be deemed waived").  Even so, that Defendants could have a diverse staff and yet discriminate against Plaintiff are not mutually exclusive scenarios.

Viewing the facts in the light most favorable to Plaintiff, therefore, Plaintiff has met his burden to satisfy the steps of the McDonnell-Douglas framework.  Summary judgment on Plaintiff's discrimination claim will therefore be denied.[8]

## C. Retaliation claims

### i. *Prima facie case*

Plaintiff's retaliation claims are also governed by the tripartite McDonnell-Douglas framework.  A prima facie case of retaliation requires a showing that: (1) Plaintiff engaged in a protected activity, which can include informal protests of discriminatory employment practices such as making complaints to management; (2) he was subjected to an adverse action by the employer either after or contemporaneous with the employee's protected activity; and, (3) there is a causal connection between the protected activity and the adverse action.  *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).

As with the discrimination claim, the parties only contest whether Plaintiff has met the final element of the prima facie case, *i.e.*, whether he has sufficiently shown causation.  "[A] plaintiff may rely on 'a broad array of evidence' to demonstrate the causal link between [the] protected activity and the adverse [employment] action taken."  *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007), *as amended* (Aug. 28, 2007) (quoting *Farrell v. Planters*

---

[8] Defendants also argue that Plaintiff was "unable to provide any specifics with regard to time, location, or context" for the comments St. John allegedly made.  However, Plaintiff testified that St. John used the slur a month or two before he was suspended for a second time in October.  Defendants point to testimony from St. John that he denied ever calling Plaintiff "faggot," or "gay guy," but Defendants' citation simply amounts to an argument questioning Plaintiff's credibility, which is an issue reserved for the jury.  *Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993) ("Summary judgment is inappropriate when a case will turn on credibility determinations.")

*Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000)).  He can meet this burden by proffering

evidence of an employer's inconsistent explanation for taking an adverse employment action,

*Waddell v. Small Tube Products, Inc.*, 799 F.2d 69, 73 (3d Cir. 1986), a pattern of antagonism,

*Woodson v. Scott Paper Co.*, 109 F.3d 913, 920-21 (3d Cir. 1997), or temporal proximity

"unusually suggestive of retaliatory motive," *Shaner v. Synthes*, 204 F.3d 494, 505 (3d Cir.

2000) (internal quotation marks omitted).  "These are not the exclusive ways to show causation,

as the proffered evidence, looked at as a whole, may suffice to raise the inference."  *Kachmar v.*

*SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997).

The parties dispute whether the timing of the adverse employment actions in this case are

"unusually suggestive" of retaliatory motive.  A brief review of those events is thus warranted.

Plaintiff was suspended without pay for two weeks on July 7th.  He was suspended again

for several weeks on October 18th.  Devose recommended Plaintiff's termination by email to

Donato on December 29th.  And Donato officially terminated Plaintiff on January 15th.

In arguing that Plaintiff has not shown temporal proximity "unusually suggestive" of

retaliatory motive, Defendants completely ignore Plaintiff's two unpaid suspensions, which they

do not contest are adverse employment actions.  *Friel v. Mnuchin*, 474 F. Supp. 3d 673, 686-87

(E.D. Pa. 2020), *aff'd*, 2021 WL 6124314 (3d Cir. Dec. 28, 2021) (holding that unpaid

suspension is an adverse employment action).  Instead, Defendants argue that Plaintiffs'

termination on January 15th occurred months after Plaintiff's first complaint of discrimination

regarding Haynesworth's "faggot" comment on July 3rd, and thus much too late to be considered

suggestive of retaliation.

But Defendants' argument misses the point.  Plaintiff is not only contending that he was

*terminated* in response to his July 3rd complaint; he asserts that he was suspended without pay,

18

only a few days later, on July 7th.  Neither party disputes that a few days qualifies as timing

"unusually suggestive" of retaliatory animus, *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d

Cir.1989).  Plaintiff has thus met his prima facie case as to his claim that he was suspended on

July 7th in retaliation to his complaint.[9]

Defendants also argue that Plaintiff's official termination on January 15th is too distant

from his formal complaint to HR on November 25th to suggest retaliatory motive.  But courts

have held that even longer time periods can be considered suggestive of such motive.  *Fasold v.*

*Justice*, 409 F.3d 178 (3d Cir. 2005) (holding that time frame of less than three months meets

standard).  Moreover, Plaintiff notes that Devose's actual recommendation to terminate

Plaintiff—on December 29th—occurred only two days after Plaintiff followed up with her by

email and spoke to her on the phone about his coworkers' alleged misconduct.  This timing too is

unusually suggestive of Defendants' motive.  *Jalil*, 873 F.2d at 708.[10]  Plaintiff has thus met his

prima facie case for his claim of retaliation with respect to his termination.[11]

---

[9] Defendants never address whether Plaintiff's suspension on October 18th constituted retaliation for his complaints; they thus waive any challenge to Plaintiff's retaliation claim as it pertains to the second suspension.  *Laborers' Int'l Union*, 26 F.3d at 375, 398 (3d Cir. 1994).

[10] Defendants also argue that Plaintiff fails to meet the prima facie case because he has failed to show evidence that his complaints were a "but for" cause of the adverse employment actions.  But Defendants refer to the incorrect legal standard.  Although a plaintiff must ultimately show that retaliatory animus was the but-for cause for the adverse employment action, the Third Circuit has held that "a plaintiff alleging retaliation has a lesser causal burden at the prima facie stage."  *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 258-59 (3d Cir. 2017).  At that stage, "the plaintiff must produce evidence 'sufficient to raise the inference that her protected activity was the *likely reason* for the adverse [employment] action.'"  *Id.* (quoting *Kachmar*, 109 F.3d at 177) (emphasis added).  The argument is therefore meritless.

[11] Even assuming that the timing of the adverse employment actions relative to the complaints are not "unusually suggestive" of retaliatory motive, the causation prong is supported by reviewing the record as a whole.  *Farrell*, 206 F.3d at 286 (explaining that evidence of casual link is "not limited to timing and demonstrative proof," but can include "other evidence gleaned from the record as a whole.")  As explained in the pretext analysis, inconsistencies in Defendants' testimony supplies further support in favor of Plaintiff's prima facie case.  *See id.* (acknowledging that evidence of pretext can often be used to show evidence of a prima facie case, and that "the McDonnell Douglas formula does not compartmentalize the evidence so as to limits its use only one phase of the case.") (citing *Jalil*, 873 F.2d at 709 n.6) (quotations omitted).

### ii.     Legitimate, Non-Discriminatory Reason

Defendants' legitimate, non-discriminatory reason for terminating Plaintiff remains the same: that Plaintiff violated workplace policy by threatening co-workers during the July and October 2020 incidents.  Defendants have provided evidence in support of this explanation, and have thus met their burden at this step of the McDonnell-Douglas analysis.  *Burton*, 707 F.3d at 426.

### iii.     Pretext

As discussed *supra*, Plaintiff must now point to some evidence "from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Fuentes*, 32 F.3d at 765.  Plaintiff can do this by demonstrating such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."  Even "somewhat contradictory" evidence may reveal a triable issue of fact.  *Brewer v. Quaker State Oil Refin. Corp*., 72 F.3d 326, 331 (3d Cir. 1995).

Defendants argue, *inter alia*, that Plaintiff cannot show pretext because the evidence "undisputedly" demonstrates that Plaintiff was fired for making threats to co-workers on two occasions.  As already explained, whether Plaintiff made these threats is disputed.  Defendants further argue that Plaintiff cannot show that his termination was made in retaliation for his complaints, because: (1) despite his allegations, Plaintiff never made any verbal complaints to Donato, as confirmed by Donato's testimony; and, (2) any written complaints were investigated and "closed out," *i.e.*, resolved.  Plaintiff demonstrates some weakness in Defendants' version of

20

events, however.  First, although Donato did testify that Plaintiff "never" made complaints to

him about discriminatory comments by Danley or St. John, he did also testify as follows:

> Q.  When Isaac did report to you that he felt St. John was harassing and
> bullying him because he was gay, did you go to HR and talk to HR about
> that?
> A.  No.
> Q.  When about did Isaac tell you that?  I'm sure you probably don't
> remember the exact date.  But in terms of was it like after the Jackie
> Haynesworth incident but before his last day, or was it sometime before
> Jackie?
> A.  It was after, after Jackie.
> Q.  Are you able to estimate how long prior to the October incident that
> he had said that to you?
> A.  Maybe a month, maybe a month after.
> Q.  A month before the October incident or a month after the Jackie
> incident?
> A.  After the Jackie incident.

The testimony thus suggests that Plaintiff—consistent with his own testimony—may

have complained to Donato about St. John around August 2022, well before any written

complaints he had made.  Further, Donato testified that—apparently in response to some sort of

complaint—he asked St. John if he did not like Plaintiff because Plaintiff was gay.  According to

Donato, St. John responded, "no, why would I care what he is?  That's his problem, that's his

preference."  St. John, on the other hand, denied in his deposition every being approached by

Donato on the topic.  These two pieces of "somewhat contradictory" evidence reveal triable

issues of fact—whether Plaintiff did ever complain to Donato about St. John, and whether

Donato ever did anything about the complaint, assuming it was made.  A reasonable jury could,

reviewing the evidence, believe Plaintiff's version of events.  And if Plaintiff is believed, his

pretext story has additional fodder in that the same person he testified harassed him (St. John)

was assigned to be the key investigator to an incident that Defendants say is the basis of his

termination.

Defendants also argue that Plaintiff cannot show pretext because any written complaints by him were investigated and "closed out," per the testimony of Devose.  But Devose also testified that other than calling Plaintiff briefly about his complaints, she did not speak to either Donato or St. John about their relationship to Plaintiff.  Plaintiff's argument about Devose's failure to question these individuals points to a weakness in Defendants' assertion that his complaints were investigated and found to be meritless.  It thus raises disputes of fact that cannot be resolved at summary judgment; judgment must therefore be denied on Plaintiff's retaliation claim as well.[12]

### D.  Hostile Work Environment

Defendants also move for summary judgment on Plaintiff's hostile work environment claim, which is not subject to the McDonell-Douglas framework.

Title VII prohibits employment discrimination on the basis of sex, and the Supreme Court has interpreted Title VII as providing employees protection from a hostile work environment. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).  "To succeed on a hostile work environment claim, the plaintiff must establish that 1) the employee suffered intentional discrimination because of his sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of respondeat superior liability."  *Id.*  The same standards apply to claims under the PHRA and the PFPO.  *See Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996); *Mercado v. Sugarhouse HSP Gaming, L.P.*, 2019 WL 3318355, at *4 (E.D. Pa. July 23, 2019) (collecting cases and noting that hostile work

---

[12] Defendants otherwise repeat the same arguments they made regarding Plaintiff's failure to show pretext to support his discrimination claim.  Because those arguments have already been addressed with respect to that claim, they need not be repeated here.

22

environment claim under Title VII, PHRA, and PFPO are "interpreted coextensively").

Defendants only make two arguments regarding this claim: (1) that Plaintiff has no evidence to substantiate his claim other than his own allegations of discrimination; and, (2) that, even assuming Plaintiff's allegations are true, they are not sufficiently severe.

As to the first argument (which Defendants make only in passing and without supporting citation) it does not follow simply because Plaintiff relies on his own testimony, as well as emails and text messages he wrote about the events, that he is to be disbelieved.  Whether his testimony and writings are credible is for the jury to decide.  *Coolspring*, 10 F.3d at 148.

As to the second argument, Defendants argue that "the use of the word faggot itself is not sufficient," and "courts have found far more pervasive and nasty comments to fall short of the mark required to state a claim for [a] hostile work environment."  But the cases Defendants cite to are both district court opinions which are not controlling, and involve facts different than the case here.  More importantly, both of the cases cited were decided before the recent Supreme Court case of *Bostock v. Clayton Cty., Georgia*, which recognized discrimination claims based on sexual orientation.  140 S. Ct. at 1754.  They thus are not helpful data points for assessing the merits of Plaintiff's claim.

Plaintiff alleges that he was subjected to harassing conduct, including being called a "faggot," being told he liked to be "bent over," being picked on for his feminine presentation, among other comments, regularly over the course of a number of months.  These comments, if true, may be severe enough to alter the conditions of one's work environment.  *See, e.g., Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 870 (9th Cir. 2001) (finding a hostile work environment where a male employee was called "faggot" and "fucking female whore" by co-workers and supervisors).  Defendants dispute that these comments were ever made, but that is

an issue left for the jury to decide.  Summary judgment will therefore also be denied as to Plaintiff's hostile work environment claim, along with his two other claims.

An appropriate order follows.


**BY THE COURT:**


**/s/Wendy Beetlestone, J.**

_____

**WENDY BEETLESTONE, J.**